[Civ. No. 47193. Second Dist., Div. Five. Oct. 29, 1976.]

VACCO INDUSTRIES, Plaintiff and Respondent, v.
NAVAJO FREIGHT LINES, INC., Defendant and Appellant.

**COUNSEL**

Alfred D. Freis for Defendant and Appellant.

Dunne, Shallcross & Kane and Roy E. Harper for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—Appellant, Navajo Freight Lines, was the defendant in a suit brought by respondent, Vacco Industries, to recover losses for goods shipped by respondent and allegedly damaged in interstate transit by appellant carrier. The action was tried to the court, sitting without a jury, and proof was adduced that appellant had failed as common carrier to deliver the consigned machinery in an undamaged condition. The court took the case under submission and rendered a judgment for the respondent in the amount of $57,241.95 plus prejudgment interest and costs. A later motion for new trial brought by appellant was denied, whereupon appellant filed the instant appeal, contesting both liability and damages.

*Facts*

In the fall of 1970, Vacco Industries (hereinafter Vacco) completed work under a written contract with the United States Navy for a "Lube Pump Test Stand"—a sophisticated and unique piece of aircraft test machinery, and was prepared to have the equipment shipped to the Naval Air Station, Quonset Point, Rhode Island. In order to arrange transportation for the merchandise, an agent for Navajo Freight Lines (hereinafter Navajo) was contacted. After viewing the test stand, the agent saw no particular hazard in having the equipment shipped "as-is," and recommended that it simply be crated, and that each crate then be affixed to heavy wooden skids. The left, center, and right sections of the test stand were crated and skidded, without incident, and the equipment remained on the Vacco lot until it was finally loaded on the Navajo truck. The bill of lading, later entered into between Vacco and Navajo, designated a declared value of $130,000, and the carrier acknowledged that the equipment possessed substantial inherent value to the shipper.

On September 25, 1970, the three wooden crates, together with one wooden box, totalling 11,760 pounds, were loaded by Vacco employees onto a flatbed truck dispatched by Navajo. The entire loading operation was viewed by representatives of both companies, and none of the observers noticed any injury to the items as they were placed on the truck. The Navajo driver signed the bill of lading, indicating that the goods were received without exception and in apparent good order. The truck then left Vacco and proceeded to the Navajo terminal in Los Angeles where the four pieces were transferred to three separate van

trailers which took the equipment to Cleveland. There, the four pieces were loaded onto one van trailer and delivered to Quonset Point, Rhode Island. In the course of transit from Los Angeles to Quonset Point, there were at least three occasions on which the equipment was off-loaded and re-routed on separate vehicles.

The Vacco shipment arrived at the Naval Air Station in Quonset Point on October 5, 1970, and was accepted by the Naval shipping clerk without exception as to the external condition of the packing materials. In point of fact, however, it had been observed that a portion of one of the skids on the center unit had been broken off. The shipment was then placed on the naval receiving dock, without injury to any of the equipment. Subsequently, the crates were moved by naval personnel via forklift to another building several hundred yards away for unpacking. The naval inspector supervising this move indicated that it was accomplished with due care and without damaging any of the consigned merchandise.

When the crates bearing the test stand were removed by the Navy, it was found that two of the four units—the center and left sections of the test stand—were badly damaged. Vacco was immediately notified of this fact and the project engineer was dispatched to examine and report on the damaged consignment. In addition, an independent laboratory was hired to evaluate the damage for Vacco. Finally, on October 16, 1970, the Navy formally rejected the Lube Pump Test Stand, and recrated and returned the equipment to El Monte, California, for repairs at the Vacco facility. Upon completion of the repairs some months later, the test stand was returned to Quonset Point where it was ultimately accepted by the Navy pursuant to its original contract with Vacco.

At trial, respondent called to the stand its chief engineer, and the project engineer for the Lube Pump Test Stand, who testified that, after examining the equipment, it was their opinion that each section was damaged as the result of a drop during transit, which destroyed the structural integrity of the unit. Appellant put on its own expert who testified that, on the contrary, the units had sustained injury as the result of resonance vibration which occurred in the normal course of transit. On the issue of damages respondent itemized its direct repair costs, which, besides direct labor and materials, included incidental costs incurred in examining the damaged machinery, and in having it crated and shipped between Quonset Point and El Monte. In addition, an

amount for overhead and general and administrative costs was assessed as part of the overall cost of repair. Finally, a 10 percent profit was added onto the resulting figure as the price of this repair effort.

In the findings of fact and conclusions of law, the court held that the Lube Pump Test Stand was damaged in transit, while in the custody, care, and control of Navajo, and not as the result of inadequate preparation for shipment by Vacco. Judgment for plaintiff Vacco included all the aforementioned elements of damage attested to at trial.

## Contentions

In support of a reversal of the judgment, appellant essentially argues that the evidence adduced by respondent was insufficient to make out a prima facie case of carrier liability under 49 United States Code Annotated section 20, paragraph (11), and that in the alternative, conceding prima facie liability, an affirmative defense had been established—improper packing for shipment. Appellant also claims that even if it is liable without exception, certain items of damages were improper as special damages, or as items of damage not within the contemplation of the parties at the time the bill of lading was executed. From a clear appraisal of the record and applicable precedent we find that none of these contentions is well-taken.

## Discussion

### I

Both parties agree that liability in this case is governed by the Carmack Amendment to the Interstate Commerce Act (49 U.S.C.A. § 20, ¶ (11)). That law provides that an interstate carrier is liable for actual loss occasioned the shipper where goods delivered to the carrier are damaged in transit.[1] Three basic elements comprise the shipper's prima

---

[1]The applicable text of the statute reads as follows: "Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, [or] District of Columbia, . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States . . . when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; . . ."

facie case under this law: (1) that goods were delivered to the carrier in good condition; (2) that the shipment arrived at its destination in damaged condition; (3) the amount of actual losses. (*Valco Mfg. Co. v. C. Rickard & Sons,* 22 N.J.Super. 578 [92 A.2d 501, 503].) Once the shipper has established the elements of his prima facie case, negligence is presumed, and the carrier must show both that it was free from negligence, and that the damage was the product of one of the common law exceptions to liability. (*Missouri P. R. Co. v. Elmore & Stahl,* 377 U.S. 134, 138 [12 L.Ed.2d 194, 197-198, 84 S.Ct. 1142].)

■ The standards for reviewing the sufficiency of the evidence on appeal are well established. The reviewing court must consider the evidence in the light most favorable to the prevailing party, resolving any conflict in support of the judgment. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]; *Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367, 370 [210 P.2d 757].) Where the evidence is in conflict, the appellate court cannot disturb the findings of the lower court (*id.*), but where the record is silent, all intendments are indulged to support the judgment, and any error must be affirmatively demonstrated before a reversal is warranted. (*Walling* v. *Kimball,* 17 Cal.2d 364, 373 [110 P.2d 58]; *Coleman* v. *Farwell,* 206 Cal. 740, 741 [276 P. 335].)

■ The appellant first contends that respondent failed to affirmatively establish, as the first element of its prima facie case, that the equipment was delivered to the carrier in good condition. It is argued that the recital in the bill of lading, that the merchandise was received in "apparent good order" was not in itself sufficient evidence as to the condition of the units inside the crates, but rather speaks only to the condition of the crating itself. In urging this point, however, appellant takes a myopic view of the evidence. Without deciding the sufficiency of such evidence alone, we note that there was other testimony that points to the fact that the goods were in good condition at the time they were loaded onto appellant's truck. Such testimony indicated that the units were in good condition when first placed inside the crates, and that during the loading process itself, no damage was inflicted upon the crates. From this, it could properly be inferred that the goods were in fact in good condition at the time they were placed on the Navajo truck.

■ Appellant next disputes the sufficiency of respondent's case with regard to the second prima facie element—delivery of the goods by the

carrier to the consignee in damaged condition. To this end, appellant marshalls several assertions: first, that the court should not look beyond the clear receipt given the goods at their destination; second, that it was not positively established that the goods were not damaged as the result of mishandling by naval personnel between the time of delivery and the time the goods were first inspected; third, that the testimony of Navajo's expert, finding vibration damage as the result of improper packing by the shipper, is to be accorded the most weight, since this expert was the only one experienced in evaluating freight damages. Taking the foregoing assertions under consideration, we find that each is without merit.

It is true that when the crated units were first off-loaded at Quonset Point no exception was taken as to their condition by the Navy shipping clerk. This cannot be deemed, however, to foreclose any showing of in-transit damage, especially since such a receipt went only to the exterior crating, a detailed inspection of the contents of the crates being reserved until later. Further, appellant claims that the evidence shows that the goods were not in the same condition when they were unpacked by the Navy three days later as when they were first delivered by Navajo. Appellant points to testimony of Steven Buchanan, one of respondent's experts, as impeaching the testimony by the naval operations officer as to the handling of the shipment. Buchanan testified that, just prior to the inspection by respondent, the crate containing the left hand section of the Lube Pump Test Stand was observed lying flat on the ground, apparently having slid over the skids upon which it was originally attached. According to appellant, this would support a finding that the damage to this section was sustained where it sat, as the result of mishandling by the Navy, and would impeach testimony as to the careful handling of the center section, as well. Despite authority cited by appellant,[2] it was not necessary for the respondent to *rule out* the possibility of damage to the crates after they were removed from the truck, as long as some evidence was presented upon which it could reasonably be concluded that due care was exercised by the consignee in handling the merchandise. The testimony by the naval inspector, who controlled and supervised the movement of the crated goods upon arrival, establishes careful handling, and was reasonably accepted by the court as controlling on the issue of post-transit damage.

[2]*Elder and Johnston Co.* v. *Commercial Motor Freight, Inc.,* 94 Ohio App. 358 [115 N.E.2d 179]. In this case, the court noted that there was not a *scintilla of evidence* showing the care used in off-loading the crated merchandise, and thus the presumption of carrier negligence under the Carmack Amendment could not arise.

■ Turning now to the expert testimony given in this case, we cannot say that, as a matter of law, testimony by respondent's experts as to the cause of damage to respondent's equipment was inadequate to support a finding of carrier liability. Both of respondent's experts—the chief engineer and project engineer for the Lube Pump Test Stand —were intimately familiar with the construction of the equipment. Additionally, while they had had little experience in examining freight damage per se, each was a competent structural engineer with experience in stress analysis. On the other hand, while appellant's expert had similar credentials, and was experienced in evaluating freight damage, he was not familiar with the design of this particular piece of equipment, nor had he examined the damaged equipment first-hand; rather, his testimony was based upon examination of Navy photographs of the damages. In testifying from the photos, the expert even conceded that there was insufficient detail in the pictures to determine if the structural members were ripped apart as a result of a drop in transit. Undeniably his resonance vibration theory of damages had a less reliable factual basis than the theory propounded by the opposing experts. We find that the collective opinion of respondent's experts is the better reasoned and more percipient opinion, and properly led the court to the inescapable conclusion that the equipment was in fact dropped in transit. Thus, respondent did set forth a prima facie case of carrier liability under the Carmack Amendment (49 U.S.C.A. § 20, ¶ (11)), sufficient to sustain a judgment in its favor, unless respondent established such facts as might exempt it from liability under this law.

■ The five common law exceptions to the common carrier's liability for damaging goods in transit under the Carmack Amendment to the Interstate Commerce Act, are liability for injury caused by: (1) an act of God, (2) an act of the public enemy; (3) an act of public authority; (4) an act or omission of the shipper; and (5) the inherent nature of the goods. (*Secretary of Agriculture* v. *U.S.*, 350 U.S. 162, 165-166, fn. 9 [100 L.Ed. 173, 178-179, 76 S.Ct. 244].) ■ Respondent claims that it was an omission of the shipper, i.e., improper packing, or failure to internally brace its equipment, which caused the damage. But it has already been demonstrated in reviewing the expert testimony that the judge could properly have taken as true the opinions of respondent's engineers, that damage to the units was occasioned by a drop in transit, not by resonance vibration, and that the units had been properly crated for shipment without any internal bracing.[3] Thus, the trial judge properly

[3] Dr. Lancey, Vacco's chief engineer, had prepared calculations showing the structural adequacy of the frame and mental envelope supporting the Lube Pump Test Stand. He

found that appellant could not avail himself of the defense of improper packing.

Since the weight of the evidence supports a finding of liability, without any exception, the judgment finding appellant liable for damages under the Carmack Amendment was proper.

## II

Excluding interest and costs, the trial court awarded respondent shipper damages in the amount of $54,241.95. This sum was comprised of the following elements: (1) direct costs of $12,749.46, which, aside from materials, included these incidental expenditures: shipping costs of $3,803 (Quonset Point to Vacco and return), Navy packaging costs of $1,200, a lab inspection fee of $500, an evaluation trip by the Vacco project engineer costing $481.57, and other miscellaneous costs of $2,000; (2) direct labor costs of $8,256; (3) overhead of $15,521 (188 percent of the direct labor cost); (4) general and administrative costs of $12,784.26 (35 percent of the first three items), and (5) profit of $4,931.07 (10 percent of the total repair costs). Respondent objects to the allowance of all incidental costs of repair, overhead, G & A, and the profit item, as inappropriate items of special damages, and, in the alternative, as being excessive. These objections will be taken up in order.

■ The Carmack Amendment provides for the recovery of "actual loss" for goods damaged by the carrier in transit. Reasonable costs of repair are recoverable as one of the alternative measures of damages for goods injured in transit, especially when the goods are unique in the marketplace—as is the case with the Lube Pump Test Stand. (*Conditioned Air Corp.* v. *Rock Island Motor Transit Co.,* 253 Iowa 961 [114 N.W.2d 304, 307, 3 A.L.R.3d 679]; see *Richards Mach. Co.* v. *McNamara Motor Express, Inc.,* 7 Wis.2d 613 [97 N.W.2d 396, 398].) Incidental costs which are necessarily encompassed as actual losses under this measure of recovery are transportation costs to and from the place of repair (see *Olsen* v. *Railway Express Agency, Inc.* (10th Cir. 1961) 295 F.2d 358, 360), and, concomitantly, packaging costs in conjunction with such a shipment. Similarly, expenses incurred in examining a damaged shipment to ascertain the extent of loss prior to repair—in this case, the lab fee and evaluation trip, are recoverable actual losses incident to a repair

---

further stated that because of the strength of the framework in the center section and the number of resonant frequencies for each member of the console, there was no danger that any structural components might go into resonance.

effort. (*Campbell Soup Co.* v. *Darling Transfer Inc.* (D.Neb. 1961) 193 F.Supp. 408, 409; *Meletio Sea Food Co.* v. *Gordons Transports* (Mo.App. 1946) 191 S.W.2d 983, 986.) Insofar as these items of expense are the natural and probable consequence of the damage done to the goods, they cannot be classified as "special damages," either in contract or in tort. (See *Conditioned Air, supra,* at p. 308.)

■ Indirect repair costs in the form of overhead and general and administrative costs (hereinafter G & A) may be recoverable actual losses for goods damaged in interstate transit to the extent that they are a reasonable allocation of the indirect costs of manufacturing an item. (*Conditioned Air, supra,* at p. 311; 14 Am.Jur.2d, Carriers, § 644.) Appellant contends, however, that these figures were excessive insofar as the *Conditioned Air* court approved a figure which was a substantially lesser percentage of the direct costs than was the case here. It seems reasonable, though, that the allocation of such costs over the direct costs of manufacturing should be gauged in the context of the established practice of the individual business, as well as the particular industry of which that business is a part. In the instant case, a Vacco executive testified that upon every contract which the company successfully negotiated with the government, many of which involved repair or refurbishing of aerospace equipment, a 200 percent burden and a 35 percent G & A was assessed against the direct costs of repair. Further, an expert in the government contracting field testified that the Vacco accounting practices with respect to overhead and G & A was consistent with accounting policies customarily employed in government and industry. In light of such a showing, we cannot hold, as a matter of law, that the overhead and G & A figures charged against the direct costs of repairing the Lube Pump Test Stand were excessive.

■ The 10 percent profit on repairs allowed by the trial court, on first glance, seems somewhat more problematical than the foregoing items of damages. Relying on *Meletio Sea Food Co.* v. *Gordons Transports, supra,* 191 S.W.2d 983, 986, respondent claims that, considering the profit already earned by appellant on its underlying contract with the Navy, allowance of a profit on repairs would effect an impermissible double recovery. *Meletio* is distinguishable from the case at bar, however. There, the goods damaged in transit were fungible items manufactured by the shipper. A profit on top of the replacement cost of the items was disallowed. Here, we have a unique and sophisticated piece of equipment which required extensive repairs, and which, by virtue of the man

hours necessitated, deprived the respondent shipper of other profitable business. Allowance of a reasonable profit on such a repair effort would not constitute a "double recovery," but rather would effect compensation for the direct and immediate consequence of the carrier's presumed negligence in damaging the consigned goods. Thus, like the incidental costs of repair, the profit item is a recoverable item of general damages. (See *Martin* v. *Deetz,* 102 Cal. 55, 68 [36 P. 368]; *Johnson* v. *Central Aviation Corp.,* 103 Cal.App.2d 102 [229 P.2d 114]. See also *Texas and New Orleans Railroad Co.* v. *H. Rouw Co.* (Tex.Civ.App. 1954) 271 S.W.2d 666, 668 (phrase "full actual loss, damage, or injury to . . . property" in Carmack Amendment is not a statutory departure from common law rule of damages); 14 Am.Jur.2d, Carriers, § 649.)[4] Furthermore, as a form of lost profits, this item is not barred as being uncertain or speculative in amount, as Vacco was an established aerospace business with a history of profit-making. (See *L. W. Whitlock Truck Service, Inc.* v. *Regal Drilling Co.* (10th Cir. 1964) 333 F.2d 488, 492.) Finally, the 10 percent profit figure cannot be viewed as excessive, since the record establishes that it was a standard rate charged, and often realized, on most of Vacco's business, and was a rate which was both reasonable and competitive within the industry.

Thus, none of the damage items allowed by the trial court were either improper or excessive, and the judgment must be upheld in the amount specified.

The judgment is affirmed.

Kaus, P. J., and Hastings, J., concurred.

A petition for a rehearing was denied November 18, 1976, and appellant's petition for a hearing by the Supreme Court was denied December 22, 1976.

---

[4]Had Vacco had another company repair the equipment the "profit" charged in such repair would be recoverable by Vacco. We see no reason to reduce that portion of damage merely because Vacco accomplished the repair itself.